UNITED STATES DISTRICT COURT

District of Maine

| | | |
|---|---|---|
| Nicholas A. Gladu, | X | |
| Plaintiff | : | |
| | : | **VERIFIED COMPLAINT FOR DAMAGES AND** |
| v. | : | **INJUNCTIVE RELIEF WITH JURY TRIAL** |
| Maine Dep't of Corrections; Troy Ross, Deputy | : | **DEMANDED** |
| Warden; and Gladys Cassese, Unit Mgr., sued in | : | |
| thier individual and official capacities; | : | |
| Defendants | X | |

## I. Introduction

1. This is a § 1983 action filed by Plaintiff Nicholas Gladu, a state prisoner, alleging violation of his constitutional rights and seeking injunctive relief and money damages. Plaintiff also seeks an injunction and damages pursuant to the Americans with Disabilities Act and the Rehabilitation Act.

## II. Jurisdiction

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 in that this is a civil action arising under the Constitution of the United States.

3. Jurisdiction of this Court is invokes pursuant to 28 U.S.C. §1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured by Acts of Congress providing for equal rights of persons within the jurisdiction of the United States.

## III. Parties

4. Plaintiff Nicholas Gladu at all times relevant was confined by the Maine Dep't of Corrections (MDOC) at Maine State Prison (MSP).

5. Defendant Maine Dep't of Corrections is a state agency which has been, at all relevant times, an entity that maintains and administers, and has under its control all Maine correctional facilities and their prisoners.

6. Defendant Troy Ross at all relevant times was Deputy Warden of Security at MSP employed by MDOC.

7. Defendant Gladys Cassese at all relevant times was Unit Manager of the Special Management Unit (SMU) at MSP employed by MDOC.

At all relevant times, Defendants Ross and Cassese, were acting under color of state law and are being sued in thier individual and official capacities.

IV. Exhaustion of Available Remedies

8. Plaintiff exhausted his administrative remedies on those claims requiring exhaustion prior to filing this complaint.

V. Factual Statement

9. Plaintiff suffers from severe polyuria (of presently unknown etiology). At times, Plaintiff voids 8-10 oz. of urine every 15-20 minutes.

10. On October 31, 2019, Plaintiff was evaluated by PenBay Urology for his polyuria and recurrent hematuria. Plaintiff's urologist stated that his polyuria sounded like diabetes insipidus and recommended consult by nephrology. Urinary analysis performed at that visit revealed low specific gravity (which abnormaility is consistent with diabetes insipidus).

11. Upon information and belief, diabetes insipdus (DI) is a medical condition that is typically secondary to a primary disorder of neurogenic, diplopic, or nephrogenic etiology. DI causes a person to void extremely excessive amounts of urine and has consequent serious risks of severe dehydration. Initial treatments for DI are generally increased fluid consumption to compensate for increased urine production/ water loss.

12. On April 12, 2019, Plaintiff was evaluated by Maine Nephrology Associates. Plaintiff's nephrologist agreed with urology's suspicion of DI and determined that a workup for DI (among other disorders) was necessary. Plaintiff's nephrologist requsted that he be returned at a later date for an AM appointment where specific testing for DI would be performed.

13. To date, such appointment has not occurred.

14. On April 13, 2019, Plaintiff was disciplined for urinating outside in a recreation cage during his 2 hour rec. period (which practice was up to that point the informal rule for prisoner access to a restroom during outside recreation periods). Plaintiff (nor any other prisoner) are offered restroom access during recreation periods. In fact, even if a prisoner wanted to ask a staff member for access to the restroom during recreation, he often would not be able to due to staff neglecting to perform well-being checks and/or security rounds outside.

15. On this date, however, supervisory staff noticed Plaintiff urinating in the corner of his designated recreation cage. Plaintiff admitted to security staff when confronted that he had urinated 3-4 times that rec period in just a 50-60 minute span. As a result, staff revoked the remainder of Plaintiff's recreation for that day and instituted formal disciplinary action for Class A "Bodily Fluids."

16. Plaintiff explained to security staff that he had documented medical issues that caused him to void excessive amounts of urine througout the day.

17. Plaintiff was not notified prior to said date of any changes to that informal rule for prisoner access to a restroom during recreation periods. As such, Plaintiff had not made any prior formal request for reasonable access to a restroom during his recreation times.

18. On or about April 21, 2019, Plaintiff submitted written request to Matthew Magnusson, Warden for access to a restroom every 15 minutes (as needed only) during all furture recreation periods.

19. On or about April 30, 2019, Plaintiff received response from Robert Costigan ("Prison Administrative Coordinator") concerning his formal request for reasonable accommodation. Costigan stated: "Please submit a sick call slip to determine your medical needs for access to a restroom."

20. On or about May 01, 2019, Plaintiff submitted a follow-up letter to Warden Magnusson explaining that medical staff at MSP were already well-aware of his polyuria and that Plaintiff had recently been evalualted by both urology an d nephrology for the issue (which is/was suspected to be DI).  Plaintiff also explained that a battery of diagnostic testing was being performed at some upcoming appointment and pointed out that prison medical staff had scheduled a 24-hour urinary output test months earlier but had yet to occur (due to inadequate staffing levels).

21. Plaintiff received no further response from Warden Magnusson nor Robert Costigan concerning this request for reasonable accommodation.

22. On or about April 24, 2019, Plaintiff submitted written request to Gladys Cassese (SMU Unit Manager) for access to a restroom during all out-of-cell recreation and programming.  The latter portion was discussed verbally to clarify the extent of Plaintiff's request.

23. On the same date, Plaintiff was permitted outside recreation again for the first time since 04/13/2019 where discipline was instituted for urinating in the rec yard.  While being escorted to a recreation cage outside, Plaintiff asked unit staff (Officer Mason) if he could provide Plaintiff access to a restroom as needed due to his documented medical issues (polyuria/DI).

24. Officer Mason denied Plaintiff's request stating: "carting you back-and-forth from the rec-yard would be a headache."  Plaintiff was told if he needed to urinate during his 2 hour rec. period than he would forfeit the remainder of that recreation time.  Which Plaintiff chose to do just 15 minutes into that recreation period to avoid further disciplinary action.  Plaintiff was able to make such request when unit staff escorted another prisoner to the rec-yard.

25. On April 30, 2019, Gladys Cassese denied Plaintiff's request for reasonable accommodation stating "[there] is nothing on file to make accommodation for." On the same day, Cassese told Plaintiff that medical had not yet diagnosed Plaintiff with DI and as a result no accommodation would be made until a diagnosis was made.

26. On April 30, 2019, Plaintiff filed a first-level grievance on the aforesaid denial of reasonable accommodation.

27. On April 25, 2019, Plaintiff was found guilty of Class A Bodily Fluids by the DHO following a disciplinary hearing.  The DHO imposed 30 days disciplinary restriction for that violation.

28. On May 01, 2019, Plaintiff appealed the DHO's recommended guilty finding and dispostion. Plaintiff again pointed out to prison staff that he had documented medical issues that caused him to void excessive amoutns of urine (which was the basis for the conduct alleged in the disciplinary report).

29. On or about May 15, 2019, Deputy Warden Troy Ross affirmed the aforesaid conviction and disposition.  There are no furhter appeals available to a prisoner to challenge disciplinary action.

30. On June 03, 2019, Plaintiff was again subject to formal discipline for urinating outside during his 2 hour recreation period.  Plaintiff admitted to unit staff that he had voided urine 3 seperate times in the 55 minutes he had been outside.  Plaintiff explained that he had a documented medical issue that caused him to void excessive amounts of urine.  Officer Lisenby revoked the remaining 65 minutes of Plaintiff's recreation period and deferred to Unit Mgr. Casses on whether to impose formal disciplinary action.

31. Casses imposed formal disciplinary action that same day (Class A "Bodily Fluids").

32. On June 04, 2019, Cassese imposed an additional punishment for the incident that occurred the day prior.  Cassese imposed a "7 day restriction on all outside recreation."  Which punishment is/was not authorized or approved by any formal departmental policy or procedure. Moreover, MDOC policy specifically prohibits staff from imposing any additional form of restriction or punishment once formal disciplinary action has been taken (for any conduct or behavior stemming from the same incident).

33. On June 04, 2019, Plaintiff brought these issues concerning unauthorized and prohibited restrictions immediately to Cassese's attention.  Cassese replied: "So what, sue me."

34. On or about June 05, 2019, Plaintiff submitted written appeal to Warden Matthew Magnusson concerning Cassese imposing an authorized restriction and also pointed out that MDOC policy prohibited multiple punishments for one incident.

35. MDOC policy requires any and all decisions concerning discipline to be appealed to the CAO, or designee, rather than grieved.

36. Plaintiff received no response from Warden Magnusson concerning said appeal.

37. From April 24, 2019 through June 18, 2019, Plaintiff's access to outside recreation has been made especially difficult and dangerous due to having to restrict all fluid intake for 3-4 (or more) hours in advance of each recreation period.  Plaintiff continuously felt extremely dehydrated throughout those recreation periods, especially during summer months.  Plaintiff was only able to perform minimal physical exercise and often felt very dizzy and disoriented and extremely parched, which symptoms dramatically reduced the quality of Plaintiff's limited out-of-cell time.

38. Plaintiff has and continues to be housed in the Administrative Control Unit (ACU) at MSP. Which housing is extremely restrictive and offers prisoners just 2 hours of out-of-cell time per day.

39. Plaintiff significantly relies on that limited out-of-cell time to maintain both his physical and mental health.

40. Plaintiff is under medical order to perform specific physical exercises each and every day.

41. From April 24, 2019, through June 18, 2019, Plaintiff's access to the ACU's indoor gym and treadmill were made especially difficult or dangerous (for those reasons set forth above) and/or denied access to altogether due to being unable to be restrained or confined to a space with no access whatsoever to a restroom for periods of time that could potentially span 30-60 minutes (or

more) depending on staffing levels and availability.

42. MDOC policy requires 2 security staff present for all prisoner escorts or movement within the ACU. Many times 2 staff will be present to provide escort to the indoor gym or treadmill, but often thereafter that 2nd staff member is called to assist elsewhere in the SMU with a code or medical escort. As a result, any prisoner confined to either area is forced to await the return of that 2nd officer or relief staff arrival before being escorted anywhere else (including but not limited to the restroom). This delay in staffing availability in the ACU can and often results in 30-45 minute (or more) intervals where no movements within ACU can happen.

43. All restroom access in the ACU is limited to the prisoner's cell only.

44. From April 14, 2019 through June 18, 2019, Plaintiff's access to the ACU law library was made especially difficult or dangerous and often denied access altogether for those same reasons set forth above.

45. From April 14, 2019 through June 18, 2019, Plaintiff's access to limited programming opportunites to ACU prisoners was made especially difficult or dangerous and at times denied altogether, for those same reasons set forth above.

46. From April 14, 2019 through June 18, 2019, Plaintiff's access to gainful mentor meetings/visit were made especially difficult or dangerous and often denied altogether, for those same reasons set forth above. Plaintiff has been assigned a prisoner mentor to meet with for 1-2 hours per week in the SMU visit booths. The SMU visit booths have no access to a restroom and prisoners can be left unattended for several hours at a time (depending on staffing availability and codes) As a result, Plaintiff has only been able to meet with his mentor twice during said duration.

47. Plaintiff's access to a mentor is a stipulation put in place by his multi-disciplinary treatment team to assist him with better behavior and communication through a positive peer role model. Plaintiff has not been able to benefit from a peer mentor/ role model due to being unable to visit with that prisoner.

48. On May 20, 2019, Plaintiff submitted subsequent request to Warden Magnusson specifically requesting reasonable accommodation to a restroom so that he could attend the only gainful programming class available in the ACU ("Houses of Healing").

49. On May 30, 2019, Gladys Casses informed Plaintiff that "absolutely no accommodations will be made until a diagnosis is made."

50. On June 05, 2019, Plaintiff spoke with Warden Magnusson concerning the aforesaid issues and denial of reasonable accommodation. Warden Magnusson told Plaintiff that he would personally request that medical staff schedule a 24-hour urinary output test, to document whether such accommodation is/was necessary. Said testing had been ordered by a medical provider several months earlier, but had not yet been scheduled due to initial confusion by security staff on testing protocols and subsequent staffing shortages.

51. On June 17, 2019, Plaintiff was escorted to a "dry cell" in the SMU for a 24 hour urinary output and fluid intake log. Plaintiff was told that security staff would escort him to/from the adjacent restroom whenever he needed to void urine. Where such void would be collected in

a designated urinal container and then turned over to nursing staff.

52. Officer Coco was assigned to supervise the initial portion of the urinary output test. Coco was tasked with logging any and all fluid intake and was instructed by Cassese to radio for support staff whenever Plaintiff requested to use the restroom.

53. Plaintiff opted to immediately produce a urine sample while support staff where on-scene and available to assist with the escort. That void was approximately 8oz. and at 9am.

54. Plaintiff noticed that one of the support staff delegated to assist with restroom escorts was a sergeant from the medium unit (which housing unit is a considerable distance from the SMU [apprx. 300 yards]). Plaintiff asked the sergeant whether he would actually be able to provide escorts "as needed" to the restroom since he often voids urine as frequently as every 15 mintues.

55. The sergeant said that he was very busy with his regular duties, but would do his best to respond as quickly as possible whenever restroom access was needed.

56. At approximately 9:15, Plaintiff asked Officer Coco to call for suuport staff to provide escort to the restroom. Officer Coco immediately radioed for escort.

57. Support staff did not arrive on-scene until nearly an hour later (approxiamtely 10:20 am). By which time Plaintiff had already voided urine twice inside the dry cell. Once inside his drinking cup and partially on the cell floor (approxiamtely 8-10 oz.) and again entirely on the cell floor (8-10 oz.) 15-20 minutes later.

58. Plaintiff was in moderate to severe pain after attempting to hold his urine until support staff arrived. Plaintiff did not void that initial urine inside the dry cell until over 30 minutes had passed and no sign of responding support staff.

59. As a result, nursing staff decided to suspend the testing until adequate staffing levels would allow for such arrangement.

60. Upon information and belief, medical staff had initially planned to provide Plaintiff with a urinal container to use inside the dry cell for each void. Where Ofc. Coco (and other supervising staff) could directly observe each void and would require no other support staff for continuous escorts to/from the restroom.

61. Upon information and belief, Gladys Cassese changed that initial plan for no clear reason and instead proceeded with an arrangement that she knew or should have reasonably known would be impossible for security staff to complete in a timely or practical manner.

62. Upon information and belief, Gladys Cassese is intentionally obstructing and/or delaying Plaintiff's urinary output test to avoid having to provide reasonable accommodation for Plaintiff's severe polyuria, whereas unit staff have already voiced that such accommodation would be "a headache" for them.

63. Countless prison staff have observed the extreme frequency issues complained of herein and many have commented on how Plaintiff is "constantly at the toilet."

64. Several disinterested prisoners have observed Plaintiff's polyuria and intend to put forth declarations.

65. Officer Helms (and an unknown officer) recently transported Plaintiff to Maine Nephrology Associates (on 04/12/2019).  During that initial consult, Officer Helms made a point to emphasize the severity of Plaintiff's polyuria during conversation with Dr. Abramson about the issue.  Helms stated: "Doc, he [Gladu] filled-up a whole jug in just the 1 1/2 hour drive down here."

66. Upon information and belief, the "jug" referenced by Officer Helm is a urinal container that holds up to one liter of urine.

67. Plaintiff's severe polyuria as alleged herein constitutes a disability or impairment that substantially limits major life activities and a major bodily fucntion.

68. Plaintiff is unable to access the aforesaid prison programs, services, and activities that he is otherwise eligible to due to MDOC's failure and refusal to provide reasonable accommodation.

69. Plaintiff's access to certain prison programs, services, and activities has been made unusually difficult or painful, because he is forced to hold excessive amounts of urine for significant periods of time.

70. Plaintiff's access to the aforesaid prison programs, services, and activities has been made unusually difficult or dangerous, because he has to restrict all fluid intake for several hours in advance which could easily lead to dehydration and other serious medical issues, especially during physical excersize or outside recreation during the summer months.

71. MDOC's refusal to provide Plaintiff reasonable accommodation merely because that accommodation (restroom access PRN) would be a "headache" or other inconvenience to MSP, constitues  disparate treatment.

72. Imposing punitive sanctions against Plaintiff for voiding urine during his 2 hour recreation periods, when MSP staff fail or refuse to provide any access to a restroom during that time, constitues disparate treatment.

73. MDOC's failure or refusal to provide Plaintiff reasonable accommodation for his severe polyuria violates the ADA and RA, regardless of whether a formal diagnosis has been made to identify the underlying etiology of Plaintiff's impairment.

74. Troy Ross's imposition of punitive sanctions against Plaintiff for a well-documented medical impairment constitutes violation of the ADA and RA and the Eighth Amendment to the United States Constitution.

75. Gladys Cassese's imposition of unauthorized punitive sanctions against Plaintiff for a well-documented medical impairment constitutes violation of the ADA and RA and the Eighth and Fourteenth Ammendments to the United States Constitution.

**Relief Requested**

    **WHEREFORE,** Plaintiff requests that this Court grant the following relief:

**A.** Declare that Defendant MDOC violated Plaintiff's rights under the Americans with Disabilities Act and Rehabilitation Act, when it failed to provide reasonable accommodation for Plaintiff's severe polyuria.

**B.** Declare that Defendant Ross violated Plaintiff's rights under the Americans with Disabilities Act and Rehabilitation Act and Eighth Amendmnent to the U.S. Constitution when he imposed punitive sanctions against Plaintiff for being unable to hold excessive amounts of urine for a siginifant period of time.

**C.** Declare that Defendant Cassese violated Plaintiff's rights under the Americans with Disabilities Act and Rehabilitation Act and Eighth and Fourteenth Amendments to the U.S. Constitution, when she imposed unauthorized punitive sanctions without affording any due process for Plaintiff's inability to hold excessive amounts of urine for significant periods of time and after refusing to provide reasonable accommodation for his severe polyuria.

**D.** Award compensatory damages for Plaintiff's physical and emotional injuries, and punitive damages.

**E.** Issue a preliminary injunction ordering Defendant MDOC to provide Plaintiff reasonable accommodation for his severe polyuria in the form of access to a restroom as needed.

**F.** Issue a permanent injunction ordering Defendant MDOC to provide Plaintiff reasonable accommodation for his severe polyuria in the form of access to a restroom as needed.

**G.** Issue an injuction ordering Defendant MDOC to expunge the disciplinary convictions described in this complaint from Plaintiff's institutional record.

**H.** Grant such other relief as it may appear Plaintiff is entitled to.

Date: 06/18/2019

Nicholas A. Gladu
MDOC# 21853
Maine State Prison
807 Cushing Rd.
Warren, ME 04864

## VERIFICATION

I, Nicholas Gladu, swear under penalty of perjury that the contents of the forgoing complaint are true and correct.

Executed this _18_ day of ____June____, 2019.

Nicholas A. Gladu